**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| RESINTECH, INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>AIG SPECIALTY INSURANCE COMPANY<br>and ODELL STUDNER GROUP,<br><br>*Defendants.* | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br><br>No. 21-19843 (KMW) (AMD)<br><br><br>**OPINION** |

APPEARANCES:

Steven J. Pudell, Esq.
Luma S. Al-Shibib, Esq.
**ANDERSON KILL, P.C.**
One Gateway Center, Suite 901
Newark, NJ 07102

      *Attorney for Plaintiff ResinTech, Inc.*


Laurence M. McHeffey, Esq.
Joyce Elizabeth Boyle, Esq.
Kevin MacGillivray, Esq.
**MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
7400 East Orchard Road, Suite 320S
Greenwood Village, CO 80111

      *Attorneys for Defendant AIG Specialty Insurance Company*


John C. Sullivan, Esq.
Lisa A. Reilly, Esq.
**POST & SCHELL, P.C.**
Three Logan Square 1717 Arch Street, 24th Floor
Philadelphia, PA 19103

      *Attorneys for Defendant Odell Studner Group*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

Before the Court is Plaintiff ResinTech, Inc.'s ("ResinTech") Motion for Partial Summary Judgment ("ResinTech's MSJ," Dkt. No. 205); Defendant Odell Studner Group's ("Odell") Motion for Summary Judgment (Dkt. No. 196) and Motion in Limine (Dkt. No. 198); and Defendant AIG Specialty Insurance Company's ("AIG") Motion for Summary Judgment ("AIG's MSJ," Dkt. No. 197). The Court, having reviewed the parties' submissions and considered the motions without oral argument pursuant to Federal Rule of Civil Procedure 78(b), **GRANTS in part** and **DENIES in part** ResinTech's MSJ, **DENIES** Odell's MSJ and Motion in Limine, and **DENIES** AIG's MSJ.

## II.    BACKGROUND

### a.  Procedural History

ResinTech commenced this action against AIG and Odell arising from AIG's denial of coverage for environmental liabilities asserted against ResinTech by the Camden County Municipal Utilities Authority ("CCMUA") and the New Jersey Department of Environmental Protection ("NJDEP"). The operative pleading is ResinTech's Revised Fourth Amended Complaint ("Compl.," Dkt. No. 155), which asserts claims against AIG for breach of contract and declaratory judgment and, in the alternative, asserts claims against Odell arising from Odell's alleged failure to procure appropriate insurance coverage and advise ResinTech concerning its pollution-liability risks. (*See* Dkt. Nos. 196-1 at 1-2; 205-1 at 1-3.)

Following discovery, the parties filed cross-motions for summary judgment. Odell moved for summary judgment on all claims asserted against it. (Dkt. No. 196.) AIG separately moved for summary judgment on ResinTech's claims and on AIG's counterclaim seeking rescission of the policy extensions. (Dkt. No. 197.) ResinTech moved for partial summary judgment against both

AIG and Odell. (Dkt. No. 205.) The parties thereafter filed opposition and reply briefs. (Dkt. Nos. 217, 219, 221, 228, 229, 230.) The motions are fully briefed and ripe for disposition.

### b. ResinTech's Business and Environmental Exposure

ResinTech is a New Jersey-based company engaged in chemical processing, water treatment, and water purification operations. ResinTech was founded in 1986 by Michael Gottlieb and is now operated by his sons, Jeffrey Gottlieb, who serves as Chief Executive Officer, and Larry Gottlieb, who serves as President. ResinTech's operations included facilities in West Berlin, New Jersey. (ResinTech SUMF ¶¶ 1-3, Dkt. No. 205-2.)

In connection with its operations, ResinTech held permits authorizing it to discharge wastewater into the sewer system. (*Id.* ¶ 4.) Those permits required ResinTech to pretreat wastewater before discharge. (*Id.* ¶ 5.) Because ResinTech's business involved chemical processing and wastewater discharge, pollution and environmental liability were material business risks for which ResinTech sought insurance protection. (*See id.* ¶¶ 48-57.)

### c. ResinTech's Relationship with Odell and the Placement of Pollution Coverage

In 2013, Maureen Martin joined ResinTech as Head of Human Resources. (*Id.* ¶ 28.) Ms. Martin later became ResinTech's primary point of contact for insurance-related matters. (*Id.* ¶ 29.) Ms. Martin did not have formal training, specialized knowledge, or expertise in insurance, and ResinTech did not maintain an internal risk manager or risk-management department. (*Id.* ¶¶ 30-31.)

In 2015, ResinTech retained Odell as its insurance broker. (*Id.* ¶ 32.) ResinTech has presented evidence that it retained Odell because of Odell's sophistication and ability to understand insurance-policy details that ResinTech personnel were not equipped to evaluate. (*Id.* ¶ 33.) Jeffrey Gottlieb testified that Brett Studner, one of Odell's principals, told him that Odell would "read the

3

fine print" in the policies, make sure ResinTech was protected, and "fight" for important policy provisions that non-experts would not know to obtain. (*Id.* ¶ 34.)

ResinTech and Odell executed a "Brokerage Compensation and Risk Management Service Fee" agreement. (*Id.* ¶ 36.) Under that agreement, ResinTech paid Odell a "Risk Management Service Fee" of $39,308, separate from premiums charged by insurers and separate from any carrier commission received by Odell. (*Id.* ¶¶ 37-38.) The agreement stated that Odell would provide "Risk Management and Insurance" services, including identifying exposures to loss and presenting alternatives to eliminate, mitigate, or transfer those exposures. (*Id.* ¶ 39.) The agreement further described Odell as a "trusted adviser" and referred to the "advice and counsel" Odell provided to clients. (*Id.* ¶¶ 40-41.)

Odell did not place the pollution coverage directly with AIG. Rather, Odell served as ResinTech's retail broker, and RT Specialty LLC ("RT Specialty"), formerly New Day Underwriting, served as wholesale broker for the placement of ResinTech's pollution coverage with AIG. (AIG SUMF ¶¶ 1-4, Dkt. No. 197-1.) ResinTech communicated with Odell about its insurance program and did not communicate directly with RT Specialty or AIG. (*Id.* ¶ 2.) Odell communicated with RT Specialty, and RT Specialty communicated with AIG. (*Id.* ¶¶ 3-4.)

### d. The AIG Primary and Excess Policies

For the policy period January 1, 2020 to January 1, 2021, AIG issued a Commercial General Liability and Pollution Legal Liability Policy to ResinTech, Policy No. EG15423107 (the "Primary Policy," Declaration of Steven J. Pudell, Esq. in Support of ResinTech's MSJ ("Pudell Decl.), Ex. 1 – Commercial General Liability and Pollution Legal Liability Policy, Dkt. No. 205-4). (*See* AIG SUMF ¶ 8, Dkt. No. 197-1; ResinTech SUMF ¶ 84, Dkt. No. 205-2.) The Primary Policy provided a $1 million limit for Pollution Legal Liability, Coverage D. (AIG SUMF ¶ 8;

4

ResinTech SUMF ¶ 86.) AIG also issued a Commercial Excess Follow Form Policy, Policy No. EGU15424611 (the "Excess Policy," Pudell Decl., Ex. 2, Dkt. No. 205-5), with a $5 million per-occurrence and aggregate limit for Pollution Legal Liability. (AIG SUMF ¶ 12; ResinTech SUMF ¶¶ 85, 90-91.)

The parties dispute the scope of Coverage D-1 under the Primary Policy. ResinTech emphasizes that the Declarations Page identifies Coverage D as Pollution Legal Liability and states that Coverage D-1 and Coverage D-2 were "PURCHASED," each subject to a $25,000 deductible. (ResinTech SUMF ¶¶ 86-88.) AIG does not dispute that the Declarations Page contains that notation but contends that Coverage D-1(b), the coverage ResinTech invokes, is unavailable because the Policy did not include a Schedule of Insured Property(ies) Endorsement for Coverage D-1. (AIG SUMF ¶¶ 14-15.)

Coverage D-1(b) concerns third-party claims for off-site bodily injury, property damage, or cleanup costs resulting from pollution conditions beyond the boundaries of the insured property that migrated from the insured property. (*See* ResinTech's MSJ Br. at 17-18, Dkt. No. 205-1.) The Policy defines "Insured Property," as applicable to Coverage D-1, as each location identified in the Schedule of Insured Property(ies) Endorsement attached to and made part of the Policy. (AIG SUMF ¶ 14.) AIG contends that no such endorsement was attached and that, as a result, the Primary Policy did not provide Coverage D-1(a) or D-1(b) for owned locations. (*Id.* ¶¶ 14-15.) ResinTech contends that the Declarations Page and policy structure establish, at minimum, an objectively reasonable expectation that D-1 coverage was purchased. (*See* ResinTech's MSJ Br. at 17-31.)

### e. AJG's Appointment and the Policy Extensions

On September 3, 2020, Arthur J. Gallagher & Co. ("AJG") became ResinTech's broker of record. (AIG SUMF ¶ 9.) AJG thereafter negotiated what the parties describe as a renewal-turned-

5

extension of the AIG policies. (*Id.* ¶ 10.) On January 11, 2021, AIG issued Endorsement 23, extending the Primary Policy period from January 1, 2021 to April 1, 2021. (*Id.* ¶ 11.) On January 15, 2021, AIG issued Endorsement 15, extending the Excess Policy from January 1, 2021 to April 1, 2021. (*Id.* ¶ 13.)

ResinTech contends that the endorsements changed only the expiration date of the policies and left all other terms and conditions unchanged. (ResinTech SUMF ¶¶ 97-100.) AIG contends that ResinTech's November 2020 renewal application contained material misrepresentations concerning claims or potential claims, and AIG seeks rescission of the 90-day extensions on that basis. (*See* AIG's MSJ Br. at 18-22, Dkt. No. 197.)

### f.   The CCMUA and NJDEP Notices of Violation

On or about October 28, 2020, CCMUA issued a Notice of Violation to ResinTech. (ResinTech SUMF ¶ 6.) The CCMUA NOV alleged that ResinTech was the source of wastewater causing damage to a pump station and force main in the Berlin Township sewer system. (*Id.* ¶¶ 6-7.) The NOV further stated that ResinTech had violated its permits and applicable clean-water laws. (*Id.* ¶ 8.) The CCMUA NOV did not quantify damages or demand payment. (*Id.* ¶ 9.)

ResinTech received the CCMUA NOV on or about November 5, 2020, and began investigating CCMUA's allegations. (*Id.* ¶ 11.) ResinTech maintains that, during its investigation, internal samples showed its discharge to be compliant, although ResinTech continued to investigate one unexplained anomaly. (*Id.* ¶¶ 12-13.) ResinTech also maintains that, based on its historical dealings with CCMUA, it did not initially understand the CCMUA NOV to be a claim likely to result in substantial liability. (*Id.* ¶¶ 14-22.)

On or about February 4, 2021, NJDEP issued its own Notice of Violation alleging property damage to the Berlin Township Pump Station resulting from noncompliant wastewater discharges

by ResinTech. (*Id.* ¶ 10.) The CCMUA and NJDEP notices are collectively referred to herein as the "NOVs."

The dispute later escalated. On April 27, 2021, CCMUA assessed a $1.4 million penalty against ResinTech. (*Id.* ¶ 23.) On June 7, 2021, CCMUA commenced an administrative proceeding against ResinTech for damage to the sewer system. (*Id.* ¶ 24.) On June 28, 2021, NJDEP assessed a $75,000 penalty. (*Id.* ¶ 25.) ResinTech settled with NJDEP for $40,000 in February 2022 and later settled with CCMUA for $2.9 million in October 2024. (*Id.* ¶¶ 26-27.)

### g. Notice to AIG and AIG's Coverage Position

On March 26, 2021, ResinTech, through AJG, provided notice to AIG of the CCMUA and NJDEP NOVs. (*Id.* ¶ 122.) AJG sent the notice to SeverityFNOL@aig.com. (*Id.* ¶ 123.) ResinTech contends that both the Primary Policy and Excess Policy required notice to be sent to that same email address. (*Id.* ¶¶ 94-95.)

AIG acknowledged receipt of the notice through two communications. AJG received one acknowledgment on March 29, 2021 from Casey J. Svehla of AIG's "Property & Casualty Claims Intake Department." (*Id.* ¶ 124.) AJG separately received an acknowledgment on March 26, 2021 from Maureen Nunziato Attard of AIG's "Excess Claims Intake Department." (*Id.* ¶ 125.) AIG disputes that these communications established notice under the Excess Policy and contends that the March 26, 2021 notice identified only the Primary Policy. (AIG Resp. to ResinTech SUMF ("AIG's RUMF") ¶¶ 122-25, Dkt. No. 221-1.)

On July 15, 2021, AIG denied coverage. (ResinTech SUMF ¶ 126.) On November 5, 2021, AIG maintained its denial. (*Id.* ¶ 127.) In the November 5, 2021 letter, AIG took the position that "D.1 Coverage is not available to ResinTech for this matter" because a "Schedule of Insured Properties Endorsement" had not been attached to the Policies. (*Id.* ¶ 128.) ResinTech disputes

7

AIG's interpretation and contends that the Policies provide D-1 coverage for the Claim or, at minimum, are ambiguous and must be construed in accordance with ResinTech's reasonable expectations.

### h. The Present Motions

ResinTech seeks partial summary judgment that AIG breached its obligations under the Primary and Excess Policies and that AIG is obligated to provide coverage for the amounts ResinTech paid to resolve the CCMUA and NJDEP matters, together with defense costs. (ResinTech's MSJ Br. at 1-3.) In the alternative, ResinTech seeks summary judgment against Odell on the theory that, if the AIG policies do not provide the coverage ResinTech sought, Odell failed to procure appropriate pollution coverage or advise ResinTech of material coverage gaps. (*Id.*)

AIG seeks summary judgment dismissing ResinTech's claims and entering judgment on AIG's counterclaim for rescission of the policy extensions. (AIG's MSJ Br.) Odell seeks summary judgment on all claims against it, contending principally that it accurately described the coverage being procured, that ResinTech accepted that coverage, and that any alleged loss was caused by events occurring after Odell ceased serving as ResinTech's broker of record. (Odell's MSJ Br.)

## III.    LEGAL STANDARD

### a. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact" and that the movant is therefore "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material where it "might affect the outcome of the suit under the governing law." *Id.*

8

In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004). The Court may not weigh evidence, make credibility determinations, or resolve factual disputes. *Anderson*, 477 U.S. at 254-55; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

Where, as here, the parties have filed cross-motions for summary judgment, the Court must consider each motion separately and construe all facts and inferences against the moving party for purposes of each motion. *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008). The filing of cross-motions does not itself establish the absence of disputed issues of material fact. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

### b. Motion to Exclude

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702, a witness who is qualified as an expert by "knowledge, skill, experience, training, or education" may offer opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and
> (d) the expert's opinion reflects a reliable application of the
> principles and methods to the facts of the case.

Fed. R. Evid. 702.

Trial judges are charged "with the responsibility of acting as 'gatekeepers' to exclude unreliable expert testimony[.]" *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 320-21 (3d Cir. 2003) (citing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993)).

9

"Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). First, "[q]ualification refers to the requirement that the witness possess specialized expertise." *Id.* Courts "have interpreted this requirement liberally, holding that 'a broad range of knowledge, skills, and training qualify an expert.'" *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)). Second, an expert's proffered "testimony must be reliable; it must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Id.* (citations and internal quotations omitted). Third, "the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Id.* The party seeking to present expert testimony must establish that the pertinent admissibility requirements are met "by a preponderance of" the evidence. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (quoting *Daubert*, 509 U.S. at 593, n.10).[1]

Rule 702 embodies a liberal policy of admissibility. The rejection of expert testimony is the exception rather than the rule, and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" ordinarily remain the appropriate means of attacking admissible expert testimony. *Daubert*, 509 U.S. at 596; *see Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997). Accordingly, disputes regarding the factual basis of an expert's opinion, the strength of the expert's conclusions, or the weight to be accorded the testimony generally go to credibility and weight, not admissibility. *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

---

[1] The most recent amendments to Fed. R. Evid. 702 "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702, *Advisory Committee Notes on 2003 Amendments.*

## IV.    DISCUSSION[2]

### a.  Principles Governing Interpretation of Insurance Policies Under New Jersey Law

Under New Jersey law, an insurance policy is a contract and is interpreted according to principles of contract construction. *Zacarias v. Allstate Ins. Co.*, 168 N.J. 590, 595 (2001). Unlike many commercial agreements, however, insurance policies are generally contracts of adhesion drafted by insurers and offered to policyholders on a take-it-or-leave-it basis. *Id.* Consequently, New Jersey courts apply special interpretive principles designed to protect the reasonable expectations of insureds. *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 335–39 (1985).

Where policy language is clear, courts enforce the contract as written. *Zacarias*, 168 N.J. at 595. Where policy language is ambiguous, however, ambiguities are construed against the insurer and in favor of coverage. *Longobardi v. Chubb Ins. Co.*, 121 N.J. 530, 537 (1990). A policy provision is ambiguous when it is susceptible to at least two reasonable interpretations. *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008).

The Court's inquiry is not limited to facial ambiguities. New Jersey recognizes that contractual language which appears clear on its face may prove ambiguous when considered in light of the surrounding circumstances, and courts may consider extrinsic evidence to determine whether such an ambiguity exists. *See Conway v. 287 Corp. Ctr. Assocs.*, 187 N.J. 259, 268–69 (2006); *Garden State Plaza Corp. v. S. S. Kresge Co.*, 78 N.J. Super. 485, 499 (App. Div. 1963). In evaluating such ambiguities, courts may consider relevant extrinsic evidence and the objectively reasonable expectations of the insured. *See Conway*, 187 N.J. at 268–69.; *see Zacarias*, 168 N.J. at 595.

---

[2] Because AIG seeks summary judgment both on its coverage defenses and on its rescission counterclaim, the Court addresses the coverage issues first. The Court's interpretation of the policy governs the parties' rights if the policy remains enforceable, while rescission presents a separate affirmative defense that survives summary judgment.

Particularly important in this case is the role of the policy's declarations page. The New Jersey Supreme Court has recognized that the declarations page is ordinarily "the one page most likely to be read and understood by the insured." *Zacarias*, 168 N.J. at 603. Consistent with that principle, New Jersey courts have repeatedly emphasized that insurers may not use obscure policy provisions, technical drafting mechanisms, or hidden limitations to defeat coverage that the declarations page reasonably appears to provide. *See Lehrhoff v. Aetna Cas. & Sur. Co.*, 271 N.J. Super. 340, 346–48 (App. Div. 1994); *Zacarias*, 168 N.J. at 593-603.

Against that backdrop, the Court turns to the parties' dispute concerning Coverage D-1.

### b. The Declarations Page Independently Supports ResinTech's Reasonable Expectation of Coverage

AIG's position rests on the premise that the absence of a Schedule of Insured Property(ies) Endorsement necessarily means that no insured property exists under the policy. The Court rejects that premise. As explained below, the absence of the referenced Schedule creates uncertainty regarding the identification of covered property; it does not unambiguously eliminate coverage that the declarations page identifies as purchased.

Even if the Court were to conclude that the policy language itself did not create ambiguity, the declarations page independently supports ResinTech's interpretation. The declarations page identifies Coverage D as "Pollution Legal Liability." (*See* Pudell Decl., Ex. 1 – the Primary Policy; *see also* AIG SUMF ¶ 8; ResinTech SUMF ¶ 86.) Under Coverage D, both D-1 and D-2 are identified as "PURCHASED." (ResinTech SUMF ¶¶ 86-88.) The declarations page does not distinguish between D-1(a), D-1(b), and D-1(c). (*See id.*) Nor does it alert the insured that portions of D-1 allegedly do not apply. (*See id.*) The Court finds this omission significant.

As the Appellate Division explained in *Lehrhoff*, insureds are entitled to place substantial reliance on the declarations page because it is the portion of the policy most likely to be reviewed

and understood. 271 N.J. Super. at 346–48. Likewise, the Supreme Court in *Zacarias* emphasized that the declarations page plays a central role in shaping the insured's understanding of the coverage purchased. 168 N.J. at 611–12. The Court does not read *Lehrhoff* as establishing a rule unique to automobile insurance. Rather, *Lehrhoff* reflects a broader principle recognized repeatedly by New Jersey courts: where the declarations page affirmatively represents that coverage has been purchased, limitations inconsistent with that representation must be communicated with sufficient clarity to defeat the insured's reasonable expectations.

Here, a reasonable insured reviewing this declarations page would conclude that Coverage D-1 had been purchased. Nothing on the declarations page suggests that the coverage exists only for certain categories of property, only under certain subsections of D-1, or only if an additional endorsement is attached elsewhere in the policy. Indeed, AIG's interpretation would require the insured to disregard the declarations page, locate a definition several layers removed from the declarations page, discover that the definition depends on an endorsement not included in the policy, and then infer that the purchased coverage does not actually exist. New Jersey law does not impose such a burden on policyholders.

The Court therefore concludes that the declarations page independently supports ResinTech's objectively reasonable expectation that Coverage D-1 was purchased and available.

### c. The Policy Is Ambiguous Concerning Coverage D-1

#### i. The D-1 Insurance Agreement is Ambiguous

The coverage at issue arises under Coverage D-1(b), which provides coverage for certain third-party claims arising from pollution conditions that migrate beyond the insured property. The operative language provides coverage for pollution conditions that: "did not first commence before the Retroactive Date, if any, shown in the Schedule of Insured Property(ies) Endorsement."

13

(Primary Policy, Dkt. No. 205-4 at 20.) AIG argues that the absence of a Schedule of Insured Property(ies) Endorsement defeats coverage because the Schedule is referenced in the insuring agreement itself. (AIG's MSJ Br. at 11-13.) The Court does not find the policy language so clear.

As a matter of ordinary grammar and syntax, the phrase "shown in the Schedule of Insured Property(ies) Endorsement" most naturally modifies the immediately preceding phrase "Retroactive Date, if any." (Primary Policy, Dkt. No. 205-4 at 20.) The inclusion of the qualifier "if any" expressly contemplates that a retroactive date may not exist. Read in that manner, the Schedule serves merely as the mechanism by which a retroactive date would be identified where applicable. (*See id.*) If no Schedule exists, no retroactive date is supplied. At minimum, the phrase is reasonably susceptible to ResinTech's interpretation.

Under that interpretation, the absence of a Schedule does not eliminate coverage. Rather, it renders the retroactive-date limitation inapplicable. AIG proposes a different reading. According to AIG, the absence of a Schedule eliminates coverage altogether because the Schedule is an indispensable component of the coverage grant. That interpretation is not implausible. But it is no more persuasive than ResinTech's reading. At a minimum, both interpretations are reasonable. Under settled New Jersey law, where competing reasonable interpretations exist, ambiguity must be resolved in favor of the insured. *Zacarias*, 168 N.J. at 595–96; *Longobardi*, 121 N.J. at 537; *Mazzilli*, 35 N.J. at 7–8.

### ii. The Missing Schedule of Insured Property(ies) Creates an Ambiguity

The ambiguity becomes more pronounced when the Court considers the policy's definition of "Insured Property." (Primary Policy, Dkt. No. 205-4 at 20.) The policy defines "Insured Property," as applicable to Coverage D-1, as: "Each of the locations identified in the Schedule of

14

Insured Property(ies) Endorsement attached to and made a part of this policy." (*Id.* at 48.) It is undisputed that no such Schedule was attached to the policy.

AIG argues that because the definition depends entirely on the Schedule, the absence of the Schedule means that no "Insured Property" exists and therefore no coverage is available under Coverage D-1. (AIG's MSJ Br. at 11-13.) The Court disagrees. The policy does not expressly state that coverage exists only if a Schedule is attached. Nor does it provide that failure to include a Schedule voids or nullifies Coverage D-1. Rather, the policy assumes that a Schedule exists and incorporates that document by reference. When that assumption proves false, the policy becomes internally inconsistent. The Court is left with a coverage grant that presupposes the existence of a document that was never attached and a definition that depends entirely upon that same missing document. The result is an ambiguity that emerges only when otherwise definite contractual language is applied to the facts before the Court. *See Conway*, 187 N.J. at 268–69; *see Garden State Plaza Corp.*, 78 N.J. Super. at 499; *see Zacarias*, 168 N.J. at 595.

New Jersey law does not permit insurers to transform such drafting defects into forfeitures of coverage. The New Jersey Supreme Court has warned that insurance contracts should not be construed to impose "technical encumbrances or hidden pitfalls" that defeat coverage reasonably expected by the insured. *Kievit v. Loyal Protective Life Ins. Co.*, 34 N.J. 475, 482 (1961). Yet that is precisely what AIG's interpretation would accomplish. Under AIG's view, Coverage D-1 could be listed as purchased, a premium could be charged for that coverage, and the policy could contain a detailed D-1 insuring agreement, yet coverage would vanish entirely because the insurer failed to include a referenced endorsement. The Court declines to adopt such a construction.

15

Accordingly, the Court concludes that the absence of the Schedule of Insured Property(ies) does not defeat coverage. Rather, the omission creates ambiguity regarding the identification and scope of covered property. That ambiguity must be resolved in favor of the insured.

### d. Extrinsic Evidence Confirms ResinTech's Interpretation

The extrinsic evidence further supports the Court's conclusion. The record reflects that ResinTech retained Odell specifically because ResinTech lacked specialized insurance expertise and relied upon Odell's expertise to evaluate coverage. (ResinTech's SUMF ¶ 35, Ex. 35 at 34:10-20, 35:19-23.) ResinTech's insurance representative, Maureen Martin, testified that she understood the pollution coverage reflected in the policy to be "all-inclusive" pollution coverage. (ResinTech's SUMF ¶ 57; Ex. 37 at 170:10-17; Ex. 63 at 59:20-60:19, 169:11-170:17.) ResinTech's CEO, Mr. Gottlieb, testified that he read the policy provisions multiple times and found them "very confusing." (ResinTech's SUMF ¶ 59.)

Significantly, the record also contains evidence that Odell personnel themselves struggled to interpret the policy and believed that the policies provided the D-1 coverage that ResinTech contends was purchased. (ResinTech's SUMF ¶ 68 (citing Ex. 34 at Interrogatory Nos. 16-17, Dkt. No. 205-37 at 4-5).) ResinTech's broker at Odell, Ms. Selheimer, although an insurance professional, also found the Policies confusing and, in fact, admitted to a coworker at Odell that she was "not sure how all this pollution coverage works." (*Id.* ¶ 61 (quoting Ex. 21 at 2).) The record further reflects that, in a subsequent policy year, AIG modified policy language to make the absence of gradual-pollution coverage more explicit. (ResinTech's SUMF, Ex. 28, Dkt. No. 205-31 at 39-40.)

The Court does not rely on this evidence to rewrite the contract. Rather, the evidence confirms what the Court already finds from the policy language itself: namely, that the policies

16

were susceptible to multiple reasonable interpretations and that ResinTech's interpretation was objectively reasonable. *See Chubb Custom Ins. Co.*, 195 N.J. at 238.

### e.  AIG's Interpretation Would Render Coverage D-1 Illusory

The Court is also persuaded that AIG's interpretation would render Coverage D-1 largely illusory. Under AIG's theory, Coverage D-1 was identified as purchased on the declarations page, assigned a deductible, and included within the policy's coverage structure. (*See* Primary Policy, Dkt. No. 205-4 at 8.) Yet, because no Schedule of Insured Property(ies) Endorsement was attached, the purchased coverage would effectively provide no protection for the very type of liability that ResinTech sought to insure against. (*See* AIG's MSJ Br. at 14-15.)

Courts applying New Jersey law generally avoid interpretations that transform purchased coverage into an empty promise. *See Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co.*, 124 F.3d 508, 521 (3d Cir. 1997). Here, the Court need not conclude that AIG's interpretation renders Coverage D-1 entirely meaningless in every conceivable circumstance. It is sufficient that AIG's construction would substantially undermine the coverage represented as purchased and would do so based upon the insurer's own failure to include a referenced endorsement. Such a result is inconsistent with New Jersey's strong preference for protecting reasonable coverage expectations and avoiding forfeitures based on technical drafting defects.

### f.  ResinTech Provided Timely and Sufficient Notice Under the Excess Policy

AIG separately argues that, even if coverage exists, ResinTech failed to provide notice under the Excess Policy. The Court disagrees.

The record reflects that on March 26, 2021, AJG provided notice of the CCMUA and NJDEP matters to the email address identified by AIG for notice of claims. (ResinTech SUMF Ex. 8, Dkt. No. 205-11; *see* Exs. 1 and 2, Primary and Excess Policies.) The record further reflects

that AIG's Excess Claims Intake Department acknowledged receipt of that notice on the same day. (ResinTech SUMF ¶ 125, Ex. 10.) AIG argues that the notice referenced only the Primary Policy and therefore failed to satisfy the Excess Policy's notice requirements. (AIG's Opp. Br at 17-22; AIG's RUMF ¶ 122-23.) The Court finds that argument unpersuasive. The Excess Policy does not require a separate email, separate claim submission, or separate invocation of the excess policy number. (*See* ResinTech SUMF ¶¶ 94-95; *see* Excess Policy.) Nor does the policy impose any heightened notice formalities beyond providing notice to AIG through the mechanisms specified in the policy.

Moreover, at the time notice was provided, neither ResinTech nor AIG could know whether the claim would ultimately implicate only the Primary Policy or would exceed the underlying limits and potentially reach the Excess Policy. Under those circumstances, the notice provided to AIG and acknowledged by AIG's Excess Claims Intake Department was sufficient to satisfy the Excess Policy's purpose of affording timely awareness of a potentially covered claim.

At a minimum, AIG's own acknowledgment of the notice through its Excess Claims Intake Department confirms that AIG received the information necessary to evaluate the claim and investigate its potential exposure. Under these circumstances, the Court concludes that ResinTech satisfied the notice requirements of the Excess Policy.

g. **Whether AIG May Assert Additional Coverage Defenses**

ResinTech argues that AIG should be precluded from asserting coverage defenses not identified in its original denial letters. The Court need not resolve the full scope of that argument. Even assuming that AIG is permitted to assert the additional defenses advanced during this litigation, those defenses fail on the merits for the reasons discussed above.

Accordingly, the Court declines to rest its decision on waiver or estoppel principles and instead resolves the parties' dispute on the merits of the policy language itself.

**h.  AIG Is Not Entitled to Summary Judgment on Its Rescission Counterclaim**

AIG separately seeks summary judgment on its counterclaim for rescission of the policy extensions issued in January 2021. (AIG's MSJ Br. at 18-22.) According to AIG, ResinTech failed to disclose the October 2020 CCMUA Notice of Violation and related circumstances during the renewal process, and AIG contends that it would not have issued the extensions had it been aware of those matters. (*Id.* at 19-22.)

Under New Jersey law, an insurer seeking rescission based upon alleged misrepresentations in an application for insurance bears a substantial burden. Rescission is an equitable remedy that renders a policy *void ab initio* and is generally available only where the insurer establishes that the insured made a material misrepresentation or omission upon which the insurer relied in issuing coverage. *See Mass. Mut. Life Ins. Co. v. Manzo*, 122 N.J. 104, 115–16 (1991); *Ledley v. William Penn Life Ins. Co.*, 138 N.J. 627, 635–36 (1995). Materiality ordinarily turns on whether the information would have influenced the insurer's underwriting decision, while reliance concerns whether the insurer in fact acted upon the representation in issuing or extending coverage. *See Mass. Mut. Life Ins. Co.*, 122 N.J. at 115–16; *Ledley*, 138 N.J. at 635–36.

Although AIG has produced evidence supporting its rescission theory, the present record does not permit the Court to conclude, as a matter of law, that rescission is warranted. AIG relies principally on ResinTech's response to Question X of the November 2020 renewal application, which asked whether ResinTech was aware of any claims, incidents, or circumstances that might reasonably give rise to a claim. (AIG's MSJ Br. at 21-22.) AIG contends that ResinTech's failure to disclose the CCMUA NOV rendered that response materially false as a matter of law. (*Id.*)

19

ResinTech disputes that characterization. Larry Gottlieb testified that, when the NOV was received, ResinTech did not view it as a claim likely to result in substantial liability. (ResinTech's SUMF ¶¶ 14-22; Larry Gottlieb Dep., Ex. 36 at 153:6-8.) Rather, ResinTech understood the NOV as the beginning of a regulatory inquiry that required investigation and response. (*See id.*; *see also* Martin Dep., Ex. 39 at 130:1-14, 143:8-11.) Gottlieb further testified that ResinTech's internal testing indicated that its wastewater discharges were compliant and that ResinTech believed CCMUA's allegations were mistaken. (Larry Gottlieb Dep., Ex. 36 at 103:18-105:2, 153:6-8.) ResinTech also points to evidence that the NOV did not demand payment, did not quantify damages, and did not identify any specific amount of potential liability. (ResinTech's SUMF ¶ 9, Ex. 5.) A reasonable jury could conclude from that evidence that ResinTech did not believe the NOV constituted a reportable claim or circumstance within the meaning of the application.

AIG, by contrast, points to the contents of the NOV itself, which alleged violations of ResinTech's discharge permits and asserted that ResinTech's wastewater had damaged public infrastructure. (AIG's MSJ Br. at 19-22.) AIG argues those allegations were sufficiently serious that no reasonable insured could have failed to recognize their potential significance. (*Id.*) A reasonable jury could credit that view as well. These competing interpretations of the NOV create a genuine dispute concerning whether ResinTech's application response was false when made.

First, genuine disputes exist concerning the nature and significance of the information allegedly omitted from the renewal process. AIG characterizes the CCMUA NOV as an obvious precursor to substantial environmental liability and argues that ResinTech was obligated to disclose it when seeking continued coverage. (*Id.* at 19-22.) ResinTech, by contrast, has produced evidence that it did not initially view the NOV as a claim likely to result in significant liability. (ResinTech's SUMF ¶¶ 14-22.) ResinTech points to testimony that it believed the allegations lacked merit, that

20

internal testing suggested its discharges were compliant, and that it was actively investigating the issues raised by CCMUA. (Larry Gottlieb Dep., Ex. 36 at 153:6-8; Martin Dep., Ex. 39 at 130:1-14, 143:8-11.) ResinTech has also presented evidence that it viewed the NOV as part of an ongoing regulatory dispute rather than a covered insurance claim. (*See* ResinTech's SUMF ¶¶ 14-22.)

The Court does not weigh the credibility of those competing explanations at summary judgment. A reasonable factfinder could conclude that ResinTech genuinely believed that the CCMUA matter had not matured into a claim or circumstance requiring disclosure in the manner AIG now contends. Conversely, a reasonable factfinder could determine that the allegations contained in the NOV were sufficiently serious that disclosure was required. The record therefore presents a classic factual dispute regarding the significance of the information known to ResinTech at the time of the renewal process.

Second, disputes remain regarding materiality. AIG has offered evidence that knowledge of the CCMUA and NJDEP matters would have affected its underwriting decision. ResinTech, however, challenges both the scope and weight of that evidence. (ResinTech's SUMF ¶¶ 12-22.) The record contains competing evidence concerning the nature of the alleged environmental exposure, the status of the regulatory proceedings at the time of renewal, and the extent to which the information available in late 2020 differed from the circumstances that ultimately resulted in substantial penalties and settlement obligations. (*Id.*) A reasonable jury could therefore reach differing conclusions regarding whether the information allegedly omitted would have materially affected AIG's decision to extend coverage.

Third, disputed factual issues remain concerning reliance. AIG contends that it would not have issued the policy extensions had it known of the CCMUA and NJDEP matters. (AIG's MSJ Br. at 19-22.) Yet the record contains evidence regarding the longstanding underwriting

21

relationship between the parties, the role of brokers in the renewal process, the limited nature of the 90-day extensions ultimately issued, and the information actually available to AIG during that process. Resolving those competing factual contentions would require the Court to draw inferences in favor of one side and assess the weight of the evidence—tasks that are inappropriate on summary judgment.

Perhaps most importantly, AIG's rescission theory depends upon a series of factual determinations concerning what ResinTech knew, what ResinTech understood the NOVs to mean, what information was conveyed during the renewal process, and what effect additional disclosure would have had on AIG's underwriting decision. Those issues turn heavily upon witness testimony, credibility assessments, and competing interpretations of contemporaneous communications. Such determinations are properly reserved for the trier of fact. The Court therefore cannot conclude, on the present record, that AIG has established each element of its rescission counterclaim as a matter of law.

Accordingly, AIG's motion for summary judgment on rescission will be denied. The Court emphasizes, however, that today's ruling is limited. The Court holds only that genuine disputes of material fact preclude summary judgment in AIG's favor on rescission. Because the rescission counterclaim remains pending, the Court does not presently enter final declaratory relief in favor of ResinTech. Rather, the Court's rulings above resolve the parties' competing coverage interpretations and establish that, if the policies remain enforceable, AIG's coverage defenses fail as a matter of law. Whether rescission ultimately provides an independent basis to avoid coverage remains a question for trial.

22

### i.   AIG Is Not Entitled to Summary Judgment on Its Coverage Defenses

For the foregoing reasons, the Court concludes that Coverage D-1 is, at minimum, ambiguous as applied to the facts presented here. The policy's declarations page represents that Coverage D-1 was purchased. (ResinTech SUMF ¶¶ 86-88.) The policy simultaneously depends upon a Schedule of Insured Property(ies) Endorsement that was never attached. (Primary Policy, Dkt. No. 205-4 at 20.) The resulting ambiguity must be construed in favor of the insured and in accordance with ResinTech's reasonable expectations.

The Court therefore concludes that the AIG policies afford coverage for the liabilities at issue and that AIG is not entitled to deny coverage on the grounds asserted in this litigation. However, because AIG's rescission counterclaim survives summary judgment, the Court declines to enter final declaratory judgment in favor of ResinTech at this time.

### j.   Odell is Not Entitled To Summary Judgment

Odell separately seeks summary judgment on ResinTech's alternative claims arising from Odell's procurement of the AIG pollution-liability coverage and its alleged failure to advise ResinTech concerning material limitations in that coverage. (Odell's MSJ, Dkt. No. 196.) The Court concludes that genuine disputes of material fact preclude summary judgment.

As an initial matter, Odell argues that ResinTech's claims fail because Odell accurately described the coverage being procured and because ResinTech accepted that coverage. (Odell's MSJ Br. at 9, 15-17.) The Court is not persuaded that the present record permits such a determination as a matter of law. As discussed above, the Court has concluded that the policy language upon which AIG relies is, at minimum, ambiguous and reasonably susceptible to ResinTech's interpretation. That conclusion alone forecloses a finding that the scope of the coverage was so clear that no reasonable insured could have misunderstood it or that Odell

23

necessarily fulfilled any obligations it may have undertaken by merely providing the policy documents.

Moreover, ResinTech has produced evidence from which a reasonable jury could conclude that Odell's role extended beyond that of a broker who simply procured insurance requested by its client. The record reflects that ResinTech retained Odell because it lacked specialized insurance expertise and relied upon Odell to evaluate coverage issues that ResinTech personnel were not equipped to assess. (ResinTech's SUMF ¶¶ 30-36 (citing Ex. 18 and Ex. 35 at 389:21-290:7).) ResinTech has also produced evidence that Odell entered into a separate Risk Management Service Fee agreement pursuant to which Odell agreed to provide risk-management and insurance services, identify exposures to loss, and recommend methods of transferring or mitigating those risks. (ResinTech's SUMF ¶¶ 33-41 (citing Ex. 19 and Ex. 35 at 34:10-20, 35:19-23).) The agreement itself describes Odell as a "trusted adviser" and references the advice and counsel it provides to clients. (*Id.*, Ex. 19, Dkt. No. 205-22 at 2.) In addition, ResinTech has presented testimony that Odell represented it would review policy language, identify important coverage provisions, and ensure that ResinTech obtained appropriate protection for its environmental exposures. (*Id.*, Ex. 37 at 46:5-14, 48:12-20, 49:7-50:1.)

Viewing the evidence in the light most favorable to ResinTech, a reasonable jury could conclude that Odell undertook responsibilities extending beyond the mere procurement of insurance and assumed a broader advisory role with respect to ResinTech's environmental-insurance program. Whether Odell in fact assumed such responsibilities, and whether any such responsibilities were breached, are questions that cannot be resolved on the present record as a matter of law.

24

The Court likewise concludes that disputed issues of fact remain regarding causation. Odell argues that any alleged loss was caused by events occurring after AJG became ResinTech's broker of record in September 2020. (Odell's MSJ Br. at 3-4.) ResinTech, however, contends that the relevant coverage deficiency was embedded in the policies originally procured during Odell's tenure and that the later extensions merely continued the same allegedly defective coverage. (ResinTech's Opp. to Odell's MSJ Br. at 6-7.) A reasonable jury could draw competing inferences from the record regarding the extent to which any alleged deficiencies in the AIG policies originated during Odell's engagement, whether subsequent events altered the causal chain, and whether any conduct by Odell caused the damages ResinTech seeks to recover.

Finally, the Court notes that ResinTech's claims against Odell remain pled in the alternative to its claims against AIG. (*See* Compl., ¶¶ 61-81.) Although the Court has concluded that AIG's coverage position fails as a matter of law, AIG's rescission counterclaim survives summary judgment and remains pending for trial. Thus, ResinTech's alternative claims against Odell have not been rendered moot. In short, genuine disputes of material fact remain concerning the scope of Odell's undertaking, the adequacy of its advice regarding pollution-liability coverage, whether broader or different coverage was available in the marketplace, and whether any conduct by Odell caused ResinTech's alleged damages. Because a reasonable jury could resolve those issues in favor of either party, Odell is not entitled to summary judgment.

Accordingly, Odell's Motion for Summary Judgment will be denied.

### k. Odell's Motion to Exclude the Opinions of Howard Tollin

Odell also moves to exclude the opinions and testimony of Plaintiff's insurance-industry expert, Howard Tollin. (Odell's Motion in Limine, Dkt. No. 198.) The Court denies the motion.

25

Tollin is qualified to offer opinions concerning environmental insurance, pollution-liability coverage, insurance-broker practices, and industry customs. (*See* Plaintiff's Rule 26 Disclosure of Expert Witnesses, Ex. A, Report of Howard M. Tollin, Esq. ("Tollin Report"), Dkt. No. 215-2.) Tollin has decades of experience as both an attorney and insurance broker specializing in environmental and pollution coverage. (*See* Tollin's Curriculum Vitae, Dkt. No. 215-2 at 15-20.) His report and deposition testimony demonstrate substantial experience placing pollution-liability policies, negotiating policy language, advising policyholders regarding environmental risks, and participating in the environmental-insurance marketplace. (*See* Tollin Dep., Dkt. No. 215-3.) The Court is satisfied that his specialized knowledge will assist the trier of fact. *See* Fed. R. Evid. 702.

Odell's principal criticisms concern the basis for Tollin's opinions rather than his qualifications. Odell argues that Tollin relies primarily on his professional experience rather than identified treatises, regulations, or formal industry standards. (Odell's Motion in Limine Br. at 16-17.) That argument is unavailing. Rule 702 expressly permits expert testimony grounded in specialized experience, and the absence of a particular treatise or published methodology does not render such testimony inadmissible. Tollin reviewed the record and applied his experience to the facts of this case. (*See* Tollin Report at ¶¶ 8-20, 31; *see, e.g.*, Tollin Dep. 75:10-21, 82:4-85:10, 86:18-89:25, 103:24-106:17.) To the extent Odell disputes his assumptions, methodology, or conclusions, those objections go to the weight of the testimony and may be explored through cross-examination and the presentation of contrary evidence.

The Court likewise rejects Odell's contention that Tollin's opinions are impermissibly speculative. Odell's challenges largely concern the factual premises underlying Tollin's opinions and the conclusions he draws from the record. (Odell's Motion in Limine Br. at 18-21.) Those are matters for the jury to evaluate.

The Court agrees, however, that Tollin may not offer legal conclusions or instruct the jury on the governing law. Accordingly, Tollin may testify regarding insurance-industry customs and practices, the availability and characteristics of environmental insurance products, the role and responsibilities commonly undertaken by brokers and risk-management advisors, and whether the conduct alleged in this case was consistent with those customs and practices. He may not opine that Odell was negligent, breached a legal duty, violated New Jersey law, or otherwise offer legal conclusions reserved for the Court and jury. Subject to those limitations, Odell's motion is denied.

## V.    CONCLUSION

For the reasons set forth above, ResinTech's Motion for Partial Summary Judgment (Dkt. No. 205) is **GRANTED in part** and **DENIED in part**; AIG's Motion for Summary Judgment (Dkt. No. 197) is **DENIED**; and Odell's Motion for Summary Judgment (Dkt. No. 196) and Motion in Limine (Dkt. No. 198) are **DENIED**. ResinTech's motion is granted insofar as the Court determines that AIG's interpretation of Coverage D-1 fails as a matter of law and denied insofar as it seeks final declaratory relief at this stage.

The Court will enter an Order consistent with this Opinion.

Dated:   June 30, 2026

KAREN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

27